UNITED STATES of America for the Use and Benefit of GULF STATES ENTERPRISES, INC., Plaintiff–Appellant,

v.

R.R. TWAY, INC., Phil Hoffman, Inc., and Federal Insurance Company, Defendants–Appellees.

No. 90–3484
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Aug. 12, 1991.

Charles H. Braud, Jr., Covert & Braud, Baton Rouge, La., for plaintiff-appellant.

Carolyn Pratt Perry, Baton Rouge, La., for defendants-appellees.

Before JOHNSON, SMITH, and WIENER, Circuit Judges.

PER CURIAM:

Use Plaintiff–Appellant, Gulf States Enterprises Company, Inc., appeals from the magistrate judge's judgment in favor of Defendants–Appellees, R.R. Tway, Inc., Phil Hoffman, Inc., and Federal Insurance Company, on a claim under the Miller Act, 40 U.S.C. § 270a, *et seq.*, for payment of equipment rentals. Finding no error in the magistrate judge's alternative determinations that (1) the Miller Act claims were time barred, (2) Gulf States' connection with the project's prime contractor was too remote to permit recovery under the Miller Act, and (3) Gulf States' claims under Louisiana state law have no merit, we affirm.

## I.

### FACTS

R.R. Tway, Inc. (Tway), as prime contractor, entered into a contract (the Prime Contract) with the United States to perform work in connection with a Corps of Engineers project, the East Atchafalaya Protection Basin Levee Project (the Project). In

accordance with § 1 of the Miller Act, Tway executed a payment bond on which Tway was the principal and Federal Insurance Company was the surety. Phil Hoffman (Mr. Hoffman) approached Tway representatives about the possibility of providing some equipment for use on the Project. On August 2, 1984, Tway and Mr. Hoffman entered into a contract (the Dozer Contract), using a form labeled "Sub–Contract", in which Mr. Hoffman agreed individually to furnish a bulldozer to Tway on a fully operated basis, as needed, for a rate of $42.00 per operating hour. On August 30, 1984, Tway entered into a second contract (the Dragline Contract), again using a form labeled "Sub–Contract", with J.P. Hoffman, Inc.[1] (Hoffman, Inc.), in which Hoffman, Inc. agreed to perform "fill" or "dirt" work specified in Tway's prime contract.[2] At Tway's request, Mr. Hoffman personally guaranteed his corporation's performance under the Dragline Contract.

Shortly after entering into the Dragline Contract, Mr. Hoffman approached David K. Williams, Jr., owner of Gulf States Enterprises Company, Inc.,[3] (Gulf States) about renting a dozer and a dragline from Gulf States. Although there was apparently some discussion about the possibility of Mr. Hoffman buying the equipment, it is clear from the evidence that he rented both pieces of equipment from Gulf States. The rental agreements were oral. Williams was told by Mr. Hoffman that he had a contract with Tway, but Williams was not told by Mr. Hoffman that his corporation, Hoffman, Inc., also had a contract with Tway.

Gulf States rented a Kamatsu dozer and a Northwest 6 dragline to Mr. Hoffman. Gulf States invoiced Mr. Hoffman[4] for rental on the dozer from September of 1984 through April 17, 1985 for a total of $50,000.00. Gulf States invoiced Mr. Hoffman[5] for the rental of the dragline used in the performance of the Dragline Contract. The invoices covered the period of September 1984 through March 27, 1985, and totalled $36,000.00.

The dozer was not used to perform work under the Dozer Contract after December of 1984, but it was used to perform work under the Dragline Contract until March of 1985.

On June 5, 1985, Tway's attorneys demanded in writing that Gulf States remove the dozer and the dragline from the Project site. Tway refused to accept any further responsibility for the equipment, assumed Mr. Hoffman had abandoned it, and stated that the equipment had not been worked for many weeks. Gulf States removed the Kamatsu dozer on June 28, 1985, but the dragline apparently was not removed. Sometime in late June or early July Gulf States rented that dragline to Circle, Inc., another of Tway's subcontractors, for use in connection with repairing one of Circle's own draglines. Gulf States' dragline was not used in connection with completion of any work under the Dragline Contract after March of 1985.

Over a year later, on July 8, 1986, Gulf States filed suit pursuant to the Miller Act. In that suit Gulf States asserted an alternative basis for recovery under Louisiana law, insisting that it is entitled to recover on the theory that Tway had agreed to pay the debts of Mr. Hoffman and Hoffman, Inc. Gulf States also averred that under Louisiana law it was entitled to recover on the basis of unjust enrichment or quantum meruit.

■ After a bench trial, the magistrate judge ruled that Gulf States had failed to

---

1. The contract is in the name of "J.P. Hoffman, Inc.", but suit was brought against "Phil Hoffman, Inc."

2. The Dragline Contract did not expressly require Hoffman, Inc. to provide a dragline. Rather, the contract required Hoffman, Inc. to furnish "all labor, equipment, overhead, and other necessary items."

3. The original suit and this appeal were brought in the name of Gulf States Enterprises, Inc.

The entity's name is actually Gulf States Enterprises Company, Inc.

4. Mr. Hoffman requested that Tway send the bills to Mr. Hoffman's uncle, C.P. Hoffman (which bills, due to an apparent clerical error, were addressed to C.P. Huffman).

5. *See* note 4, *supra.*

establish that it had supplied equipment to a "first tier subcontractor," as required by the Miller Act, and that Gulf States' Miller Act claims were barred by the Act's one year limitation period within which to bring suit. The magistrate judge also rejected Gulf States' state law theories of recovery. Gulf States subsequently filed a motion for new trial, which the magistrate judge denied with reasons. Gulf States timely appealed the magistrate judge's decisions.[6]

## II.

## STANDARD OF REVIEW

■ This action was tried by a magistrate judge by consent of the parties, and a judgment was entered by the magistrate judge under 28 U.S.C. § 636(c). We review such judgments under the same standards that we review judgments entered by a district judge. *Lockette v. Greyhound Lines, Inc.*, 817 F.2d 1182 (5th Cir.1987). Conclusions of law are reviewed *de novo* and findings of fact are upheld unless they are clearly erroneous. Fed.R.Civ.P. 52.

## III.

## DISCUSSION

### A. *The Miller Act*

The Miller Act requires that any contractor who is awarded a contract for "construction, alteration, or repair of any public building or public work of the United States," must provide a payment bond "for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person." Section 270b(a) gives the party supplying labor and material to such a contractor the right to sue on the payment bond for nonpayment of the labor or material supplied. This right extends to those parties "having direct contractual relationship with a *subcontractor* but no contractual relationship express or implied with the contractor...." (emphasis added). Subsection (b) of § 270b goes on to provide that all suits under § 270b must be commenced within "one year after the day on which the last of the labor was performed or material was supplied...."

### B. *Issues*

This case presents three issues:

1) Did Gulf States supply the equipment to a subcontractor or did it supply the equipment to another supplier, thereby falling outside the ambit of the Miller Act?

2) Did Gulf States institute its suit within one year after last supplying the Kamatsu dozer and Northwest 6 dragline, as prescribed by § 270b(b)?

3) Did Tway agree to pay the amounts Gulf States invoiced to Mr. Hoffman and Hoffman, Inc. on the dozer and the dragline?

We consider each issue in turn.

### 1. *Mr. Hoffman: Subcontractor or Materialman?*

■ To be a "subcontractor" and come within the protection of the Miller Act, a

---

**6.** The magistrate judge entered his judgment on April 3, 1990. Gulf States filed its motion for new trial on April 16, 1990. Appellees' attorney argued in her brief that Gulf States' notice of appeal was not timely because its previous motion for new trial was filed outside the 10 day time limit of Fed.R.Civ.P. 59, which requires only that the motion be *served* (not filed) within 10 days after the entry of the judgment, and therefore did not toll the running of time for appeal of the judgment. Gulf States' attorney responded in his reply brief that the motion for new trial was indeed timely because "[n]ormally, the ten day period would have run on April 13, 1990, under Rule 59 of the FRCP. However, April 13, 1990, was Good Friday[,]" therefore Gulf States had until the following Monday to file the motion. La.R.S. 1:55 makes Good Friday a legal holiday in Louisiana. We find that the motion for new trial was timely, but not for the reason stated in Gulf States' reply brief. Fed.R.Civ.P. 6 provides that in computing any time period allowed by the rules, *all* days are to be counted except (a) for the first day and (b) for the last if it falls on a weekend, holiday or a day on which the clerk's office is inaccessible. Counsel for both failed to note that Rule 6 also provides that when the time period is less than 11 days, "intermediate Saturdays, Sundays, and legal holidays are excluded in the computation." We compute the tenth day (excluding intervening weekends and Good Friday) in fact to be April 18, 1990. Even without the benefit of Good Friday, Gulf States' motion would have been filed at least one day before expiration of the permitted period for service.

person must have a direct contractual relationship with either the prime contractor or a subcontractor of the prime contractor. *J.W. Bateson Co. v. United States*, 434 U.S. 586, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978); *United States use of Gold Bond Bldg. Products, Div. of Nat. Gypsum v. Blake Constr. Co.*, 820 F.2d 139 (5th Cir.1987). "Subcontractor", however, does not include "ordinary laborers and materialmen." Unlike a materialman, a subcontractor performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract. *Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944). The distinction between a "subcontractor" and a "materialman" turns on the substantiality and importance of the relationship between the middle party and the prime contractor. Only a middle party who has taken responsibility for a large and definable part of the construction project is a "subcontractor." Otherwise, he is a "materialman." (hereafter, "supplier") *Id.; F.D. Rich Co., Inc. v. United States*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *Aetna Casualty & Surety Co. v. United States*, 382 F.2d 615, 617 (5th Cir. 1967).

## 2. *The Dozer Contract*

■ A review of the Dozer Contract, denominated "Sub–Contract," between Tway and Mr. Hoffman indicates in paragraph one that Mr. Hoffman agrees to furnish fully operated dozers as needed at $42.00 per operating hour. The dozers were to be furnished for the construction of the "East Atachafalaya Basin Protection Levee." Contrary to Gulf States' contention, when we determine whether a contract is a "subcontract" within the meaning of the Miller Act, our findings are not

controlled by the contract's label, or the labels the parties fashion for themselves, or the labels applied to them by others with whom they do business. We must examine the content and the effect of the agreement. *United States for use of Consolidated Pipe and Supply Co. v. Morrison–Knudsen Co.*, 687 F.2d 129 (6th Cir.1982); *United States use of Bryant v. Lembke Constr. Co.*, 370 F.2d 293 (10th Cir.1966). The Dozer Contract is clearly one in which Mr. Hoffman agreed to supply dozers and operators on an "as needed" basis. Although the record does not indicate whether Mr. Hoffman's operators were supervised directly by Tway, it is clear that the contract does not specify the particular work Mr. Hoffman was to perform. It is reasonable to conclude that when working on an "as needed" basis, he and his operators must have taken direction from Tway supervisors. He did not agree to take on a definable part of the project. Mr. Hoffman was not a subcontractor, but rather a supplier.[7] *See, e.g., Id.*

## 3. *The Dragline Contract*

■ The Dragline Contract between Hoffman, Inc. and Tway, as personally guaranteed by Mr. Hoffman, was also labeled "Sub–Contract". By that contract's terms, Hoffman, Inc. was "to perform a portion of CONTRACTOR'S prime contract work," consisting primarily of "fill" work or dirt removal as described in Tway's prime contract. It might be more reasonable, then, to conclude that this was indeed a subcontract because it involves a definable part of Tway's contract for the project. But, even a finding that Hoffman, Inc. was a subcontractor to Tway cannot salvage Gulf States' claim. Mr. Hoffman individually contracted with Gulf States to rent its Northwest 6 dragline for use on the

**7.** We are aware of *United States use of Morris Constr., Inc. v. Aetna Casualty Insurance Co.*, 908 F.2d 375 (8th Cir.1990). In that case, the 8th Circuit considered a contract in which a subcontractor rented pieces of heavy equipment with operators from a supplier, and in turn supplied them to the prime contractor. The court found that contract between the prime contractor and the subcontractor was a subcontract because the contract specified that the sub- contractor was to work on specific parts of the project, the subcontractor was paid on a "line item" or "fixed price per unit" basis and not an hourly basis, and because the subcontractor in turn subcontracted out much of this work to the plaintiff. These facts are not present in the case at hand. Mr. Hoffman's equipment and operator were used "as needed," and were supervised and controlled by Tway and Mr. Hoffman was paid on an hourly basis.

Project by Hoffman, Inc. in connection with the Dragline Contract between Hoffman, Inc. and Tway. Mr. Hoffman in turn supplied the dragline to Hoffman, Inc. In addition to supplying the dozer to Tway, Mr. Hoffman supplied the same dozer to Hoffman, Inc. from time to time for use under its Dragline Contract with Tway. Because Gulf States rented the dragline and the dozer to Mr. Hoffman, who in turn supplied them to his corporation, Hoffman, Inc., Gulf States was a supplier to a supplier and did not have a direct contractual relationship with a subcontractor. Without such a direct relationship, Gulf States cannot claim coverage under the Miller Act.

Gulf States insists that Hoffman, Inc. was not in existence at the time the Dragline Contract was signed on August 30, 1984, but presented no evidence at trial to support that allegation. Indeed, Gulf States avers, at least by implication, that the defendants had the burden of proving that Hoffman, Inc. was incorporated on or before the date of the Dragline Contract. But our search of the record gives no indication that Hoffman, Inc.'s corporate status was ever in question at the trial before the magistrate judge; it appears that this issue was never raised until Gulf States' motion for new trial. Even then Gulf States failed to present anything more than a bald assertion that Hoffman, Inc. was not incorporated.

Gulf States had the burden of proving that it came within the protection of the Miller Act. As Gulf States never contended that Mr. Hoffman was not the lessee of the equipment, the true issue at trial was whether Mr. Hoffman, individually, was a Miller Act subcontractor. If as a part of its proof Gulf States truly wanted to place the status of Hoffman, Inc.'s incorporation

in question, it should have done so at trial. Because it did not, the magistrate judge did not err in failing to consider issues and evidence not properly before him—issues and evidence to which the defendants had no opportunity to respond at trial; and we refuse to consider them now.[8] *United States v. Allegheny–Ludlum Industries, Inc.,* 517 F.2d 826 (5th Cir.1975), *cert. denied* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

Gulf States further argues that Mr. Hoffman was "in essence" a subcontractor on the project because a representative of Tway testified that he "didn't check the records" when asked whether he knew if Hoffman, Inc. was incorporated and that the daily logs kept by Tway and the Corps of Engineers only listed "Hoffman" as the subcontractor, and not Hoffman, Inc. These third party beliefs and assertions have no bearing on whether Hoffman, Inc. was in fact incorporated.

As to the Dozer Contract, Mr. Hoffman is a supplier under the Miller Act as a matter of law. As to the Dragline Contract, Gulf States presented virtually no evidence that would tend to prove that Mr. Hoffman was a subcontractor and not a supplier. We find no clear error in the magistrate judge's determination of the status of Gulf States as a "supplier to a supplier" under both contracts.

C. *The Miller Act's Time Bar*

■ For a supplier to come within the protection of the Miller Act he must file his suit within "one year after the day on which the last of the labor was performed or material was supplied by him." § 270b(b).

The record indicates that the Kamatsu dozer was last used on the Dozer Contract

8. Gulf States' reliance on *United States use of Gold Bond Building Products, Div. of Nat. Gypsum v. Blake Construction,* 820 F.2d 139 (5th Cir.1987), is misplaced. In that case, Gold Bond, supplied materials to Mt. Hawley Specialty Co. who sold the materials to Interior Construction Systems, a subcontractor and Mr. Hawley's parent. Blake, the prime contractor presented evidence that the subsidiary and parent were separate entities, and the court agreed. Gulf States seems to contend that *Gold Bond*

compels the conclusion that Tway and Federal Insurance Company had at least the burden of coming forward with evidence that Hoffman, Inc. did not exist. We do not find this to be the case. In *Gold Bond,* the plaintiff claimed that the subsidiary and parent were not separate entities. Blake would then have had to come forward with countervailing evidence. Gulf States, however, never made Hoffman's corporate existence an issue, so Tway had no burden to bring forward any evidence on that issue.

in December of 1984, and was last used on the Dragline Contract in March of 1985. Gulf States issued invoices on the rental of the dozer through April 17, 1985. Further, Gulf States was notified by letter dated June 5, 1985 that Tway wanted the equipment removed from the Project site, and that Tway would take no responsibility for the equipment. Gulf States removed the dozer on June 28, 1985.

Gulf States did not file suit on either of these contracts until July 8, 1986. There can be no question that suit on the Dozer Contract is time barred. Even had we found that Mr. Hoffman was a subcontractor and not a supplier, it remains that under the Dozer Contract, the Kamatsu dozer (the only equipment rented from Gulf States which was employed under that contract), could not possibly have been and was not worked or "supplied" after June 28, 1985, the date Gulf States reclaimed possession.

The Dragline Contract, however, is slightly complicated by the fact that Gulf States did not remove the Northwest 6 dragline from the project site following Tway's June 5, 1985 demand. For Gulf States, leaving the dragline in place was a discretionary act. Gulf States cannot use its own discretionary act to its advantage in tolling the running of the statute. Such an interpretation of the statute would totally defeat it by allowing suppliers like Gulf States to prolong the tolling of the statute for an indeterminate time while they search for a new lessee or until they decide the time is right to bring suit. This result is untenable. Clearly, the concept of furnishing materials and equipment to a job site does not comprehend a virtual abandonment of equipment that had been delivered to the site long before the date in question—particularly after the lessor receives written notice to remove its equipment.

Gulf States further argues that because the dragline was rented to another subcontractor on the project, Circle, Inc., the claim was not time barred. The magistrate judge found that Circle, Inc. used Hoffman, Inc.'s dragline to repair one of its own draglines and that the Hoffman, Inc. drag-line was not used to complete the Hoffman, Inc. subcontract or the work specified in that subcontract. We find that the magistrate judge's interpretation of the evidence was reasonable. For this reason, Gulf States' reliance upon *General Electric Co. v. Southern Constr. Co.*, 383 F.2d 135 (5th Cir.1967), *cert. denied* 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148 (1968) and *United States use of Altman v. Young Lumber Co.*, 376 F.Supp. 1290 (D.S.C. 1974), is misplaced; moreover, its interpretation of those decisions is incorrect. In *General Electric* the subcontractor suffered a financial collapse during the course of the project and abandoned its subcontract. The contractor and the supplier arranged for the supplier to open a new account directly with the contractor so that materials already on order could be received promptly on the job site. The contractor then arranged for a new subcontractor to take over the abandoned work, and the new materials account was transferred to the new subcontractor. We held that the action was timely filed because it was brought within one year following the day on which the last material was furnished for the completion of the "second" subcontract. In *Altman* after the subcontractor quit the job, the supplier entered into an agreement with the prime contractor to complete the errant subcontractor's work. The court found that the supplier had until one year after entering into the second agreement to bring his Miller Act suit. The *Altman* and *General Electric* circumstances are easily distinguishable from the facts at hand. In each of these cases there were two subcontracts, with the second subcontract being, in effect, a continuation of the first in that each covered the original job, with the new subcontractor substituted for the one that abandoned the project. Here, however, the Northwest 6 dragline was never used to complete the Dragline Contract. In fact, it was never even used to complete Circle, Inc.'s subcontract on the project.

Likewise *United States on behalf of Carlisle Constr. Co. v. Coastal Structures, Inc.*, 689 F.Supp. 1092 (M.D.Fla. 1988), is inapposite. There Coastal, the

prime contractor, was the lessee of a crane from Carlisle. When Coastal was terminated from the project, it failed to remove the crane. Carlisle left the crane at the project site and rented it to the new subcontractor hired by the surety to complete Coastal's contract. Carlisle, therefore, rented the crane directly to the prime contractor in the first instance, and the subcontractor in the second instance. Furthermore, as in the *General Electric* and *Altman* cases, the second contract and the crane were both employed to complete the work specified in the original contract. We think *United States use of Taykinswell, Inc. v. Bencon Constr. Co.*, 248 F.Supp. 502 (D.Md.1965) is more instructive. In that case, Taykinswell's subcontract with Bencon, the prime contractor, was terminated. Bencon demanded that Taykinswell remove all equipment and materials from the job site. Taykinswell did not remove all of the materials and contended that the fact that its materials were left on the job postponed the running of limitations under the Miller Act. The court held that running of limitations was not postponed merely because materials remained on the job site.[9]

Because in the instant case Gulf States failed to show that Circle, Inc. contracted with Tway to fulfill Hoffman, Inc.'s subcontract, or that the dragline was used by Circle, Inc. to further the work that was to be performed under the Hoffman, Inc. contract, the magistrate judge did not err in finding that Gulf States' claims under the Miller Act were time barred.

### D. *State Law Claims*

Gulf States claims that under Louisiana law it can recover on the theory that Tway agreed to pay the debts of Mr. Hoffman and Hoffman, Inc., or on the basis of unjust enrichment or quantum meruit.

■ Article 1847 of the Louisiana Civil Code requires that an agreement to pay the debt of a third party be in writing unless the promisor had a material interest in making the promise and received something in return for it. *See* La.Civ.Code art. 1847, Comment (d). Gulf States argues that identical indemnity agreements[10] contained in the contracts into which Tway entered with Mr. Hoffman and Hoffman, Inc. are actually written evidence of Tway's promise to pay. We are not persuaded by this argument. We find that the presence of indemnity agreements actually contravenes Gulf States' argument. The indemnity agreements are not promises by Tway to pay debts created by Mr. Hoffman or his corporation; rather they are agreements that *if* Tway should be held responsible for obligations incurred by Mr. Hoffman or Hoffman, Inc., Tway has recourse against Mr. Hoffman or his corporation. The presence of the indemnity provisions actually rebuts Gulf States' argument that these agreements evince Tway's "promise to pay." If anything these indemnity agreements confirm Tway's intention to avoid responsibility for debts generated by its suppliers and subcontractors.

The magistrate judge found that the credible evidence did not establish that Tway ever agreed, orally or in writing, to pay any debts owed by Mr. Hoffman or Hoffman, Inc. We cannot say that he clearly erred in this conclusion, and we give deference to his evaluation of the credibility and weight of the evidence. *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ In addition, Gulf States argues that Tway's alleged oral "promise to pay" comes within the exception to La.Civ.Code art. 1847 which validates an oral agreement to pay the debt of a third party if the promisor had a material interest in making the promise and received something in return for it. Gulf States submits that Tway "was advantaged by having the equipment

---

**9.** *Taykinswell* involved materials. We see no justification for restricting the reasoning of that case to materials and not expanding it to include equipment.

**10.** Paragraph 8 of both contracts reads: "SUB-CONTRACTOR shall indemnify CONTRACTOR

from liability and expense from acts of omission or commission of SUBCONTRACTOR, and from claims for unpaid bills of SUB-CONTRACTOR; and CONTRACTOR may withhold payments due hereunder to cover such indemnity."

on the job, by continuing to use the equipment, and by having the benefits of continued business with Hoffman as well as with the other subcontractors." This argument fails. First, and most basically, to come within the exception there must be an oral agreement. The magistrate judge found that Tway did not make an oral or written agreement to accept the debt of Mr. Hoffman or his corporation. Second, even if Tway had been found to have made an oral agreement, the so-called advantages advanced by Tway were incidents or requirements of the contracts themselves, and were not gained by Tway in return for a promise to pay the debts of its subcontractors and suppliers. To the contrary, had Tway promised to pay these, it would have been disadvantaged financially and possibly forced to invoke its indemnity agreement.

## IV.

## CONCLUSION

The magistrate judge did not clearly err in his findings of fact, nor misinterpret any applicable provisions of law. For the reasons set forth above, the judgment of the magistrate court is AFFIRMED.