942 F.2d 946
 37 Cont.Cas.Fed. (CCH) P 76,182
 UNITED STATES of America for the Use and Benefit of T.M.S.
MECHANICAL CONTRACTORS, INC., Plaintiff-Appellant
Cross-Appellee,
v.
MILLERS MUTUAL FIRE INSURANCE COMPANY OF TEXAS, Defendant
Third-Party Plaintiff-Appellee Cross-Appellant,
v.
The CRAFTSMEN, INC., Defendant Third-Party Defendant-Appellee,
and
Joseph Breedlove, J.D. Richmond, Jr. and Doris D. Richmond,
Third-Party Defendants-Appellees.
 No. 90-8292.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 25, 1991.
Rehearing Denied Oct. 29, 1991.
 
 Robert L. Templeton, John Smithee, Robert L. Templeton & Associates, Amarillo, Tex., for plaintiff-appellant cross-appellee.
 Michael D. Farris, James A. Knox, Vial, Hamilton, Koch & Knox, Dallas, Tex., for defendant third-party plaintiff-appellee cross-appellant.
 William P. Weir, Ft. Worth, Tex., for the Craftsmen, Inc.
 Appeals from the United States District Court for the Western District of Texas.
 Before GOLDBERG, SMITH and BARKSDALE, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 The facts in this Miller Act case present a question of law: whether the delay and termination components of the subcontractor's Miller Act claim constitute "labor or material [furnished] in the prosecution of the work provided for in [the] contract." 40 U.S.C.A. § 270b(a) (1986).
 
 
 2
 Plaintiff T.M.S. Mechanical Contractors, Inc., subcontractor on a government construction project, appeals from a judgment denying its delay and termination claims against Miller Act surety Millers Mutual Fire Insurance Company of Texas. Defendant Millers Mutual Fire Insurance Company of Texas cross-appeals from a judgment of $100,104.19 plus interest and costs awarded to the Plaintiff on its contract work claim.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 3
 The Craftsmen, Inc. ("Craftsmen") contracted with the Veterans Administration ("Government") on April 5, 1984 to perform fire and safety corrections on the Veterans Administration Medical Center in Waco, Texas ("Contract"). Craftsmen secured a payment bond from Millers Mutual Fire Insurance Company of Texas ("Millers"), as required by 40 U.S.C.A. § 270a(a) (1986)[1] ("Bond").
 
 
 4
 Craftsmen subcontracted all the mechanical work under the Contract to T.M.S. Mechanical Contractors, Inc. ("TMS") on May 4, 1984 ("Subcontract"). The Subcontract incorporated the Contract's plans, specifications, and general conditions of the specifications. TMS based its Subcontract price of $727,000 on a bid that considered the value of the labor and materials necessary to complete the Subcontract work, overhead, profit, tools and equipment, labor burden, insurance costs, food, and shelter.
 
 
 5
 After discovering asbestos in some of the buildings involved in the performance of the Contract, the Government issued change orders enlarging the scope of the Contract work to include asbestos abatement. The Government partially terminated the Contract on October 10, 1985 pursuant to paragraph 18 of the Contract, entitled "Termination for Convenience of the Government."[2]
 
 
 6
 Upon receipt of a Notice of Termination from the Government, Craftsmen in turn terminated the Subcontract. At that time, TMS had provided $387,735.00 worth of labor and materials in the performance of the Subcontract and $485,845.90 in the performance of the change orders. TMS, however, continued to provide labor and materials until March of 1986.
 
 
 7
 TMS subsequently sued Craftsmen as prime contractor and principal on the Bond and Millers as surety on the Bond,[3] and, at trial, claimed $201,580.00 for completed contract and change order work, $467,738.00 for expenses caused by construction delay, and $251,580.00 for expenses caused by the partial termination. Millers paid TMS $101,040.81 of its contract work claim, $48,150.08 of its termination claim, and $27,000.00 in interest. After a bench trial, the district court awarded TMS $100,104.19, roughly the balance of its contract and change order work claim, plus pre- and post-judgment interest against Millers,[4] but concluded that TMS could not recover either its delay or termination claim against the Miller Act surety. TMS now appeals from that judgment.[5] Based upon our independent appellate review, United States ex rel. Gulf States Enterprises, Inc. v. R.R. Tway, Inc., 938 F.2d 583, 586 (5th Cir.1991) (per curiam), we reverse as to the delay claim and affirm as to the termination claim.[6]
 
 II. THE MILLER ACT
 
 8
 This is a Miller Act[7] case, and, thus, this is a lien case. A mechanic's lien under state law against improved property provides security for suppliers of labor and material to private construction projects, but a mechanic's lien cannot attach to government property. F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 122, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1974) (citation omitted). The Miller Act requires that a contractor on a federal construction project furnish "a payment bond ... for the protection of all persons supplying labor and material in the prosecution of the work provided for in [the] contract."[8] 40 U.S.C.A. § 270a(a)(2) (1986). The payment bond, "intended ... to protect the rights of these suppliers" who furnish labor or materials to government construction projects, thus provides an alternative to a mechanic's lien, F.D. Rich, 417 U.S. at 122, 94 S.Ct. at 2161, because it permits the supplier to sue the Miller Act surety on the payment bond. Specifically, the Act provides that
 
 
 9
 [e]very person who ... furnish[es] labor or material in the prosecution of the work provided for in [the] contract ... who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done ... or material was furnished ... for which such claim is made, shall have the right to sue on such payment bond for the amount ... unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him.
 
 
 10
 40 U.S.C.A. § 270b(a) (1986).
 
 
 11
 The Supreme Court has instructed us to liberally interpret the Miller Act "to effectuate the purpose of Congress." Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 380, 37 S.Ct. 614, 616, 61 L.Ed. 1206 (1917).[9] For example, the Court "has repeatedly refused to limit the application of the act to labor and materials directly incorporated into the public work." Brogan v. National Surety Co., 246 U.S. 257, 261, 263, 38 S.Ct. 250, 251, 252, 62 L.Ed. 703 (1918) (holding that groceries supplied to a contractor who was compelled to provide board and lodging for its laborers "[were] used exclusively in the performance of the work").
 
 
 12
 Certain limitations, however, stem from the language of the Miller Act. The Act extends the right to sue on the payment bond "to those who ha[ve] a contractual agreement with the prime contractor or with a 'subcontractor.' "[10] F.D. Rich, 417 U.S. at 122, 94 S.Ct. at 2161 (citation omitted); see J.W. Bateson Co. v. United States ex rel. Board of Trustees of National Automatic Sprinkler Industry Pension Fund, 434 U.S. 586, 589-90, 98 S.Ct. 873, 875, 55 L.Ed.2d 50 (1978). Moreover, the supplier must sue on the Miller Act payment bond within one year of furnishing labor or material in the prosecution of the contract work.[11] United States ex rel. Texas Bitulithic Co. v. Fidelity and Deposit Co., 813 F.2d 697, 699 (5th Cir.1987) (describing one-year limitation period as a "substantive limitation of the rights conferred by the Act").
 
 
 13
 The central issue here concerns another, still-evolving limitation on the scope of a supplier's recovery against a Miller Act surety: the extent of recoverable "labor or material [furnished] in the prosecution of the work provided for in the [government construction] contract." 40 U.S.C.A. § 270b(a) (1986). TMS contends that the district court erred in denying recovery for amounts expended because of delayed performance and partial termination. We examine each of these claims separately.
 
 A. Delay
 
 14
 TMS claims that delays caused by the asbestos abatement work dramatically increased its direct and indirect project overhead.[12] TMS urges this Court to find that the district court erred by concluding that TMS could not recover on the payment bond for the components of its Delay Claim. We reverse the district court's judgment denying recovery on TMS's Delay Claim and remand for further proceedings consistent with this decision.
 
 
 15
 Many courts have confronted delay claims in cases brought on Miller Act payment bonds; some primarily consider the cause of the delay, e.g. United States ex rel. Superior Insulation Co. v. Robert E. McKee, Inc., 702 F.Supp. 1298 (N.D.Tex.1988), while others focus on the terms of the contract, e.g. Continental Casualty Co. v. Schaefer, 173 F.2d 5 (9th Cir.), cert. denied, 337 U.S. 940, 69 S.Ct. 1517, 93 L.Ed. 1745 and, 338 U.S. 820, 70 S.Ct. 63, 94 L.Ed. 497 (1949). To qualify for a Miller Act lien, however, the claimant must come within the explicit nomenclature of the Miller Act. We thus believe that the language of the statute, interpreted in light of its protective purpose, provides the analytical key to determining whether the supplier can recover under the Miller Act.
 
 
 16
 We are persuaded by the Court of Appeals for the Eleventh Circuit's recent decision in United States ex rel. Pertun Construction Co. v. Harvesters Group, Inc., 918 F.2d 915, 918 (11th Cir.1990), that a subcontractor can recover increased out-of-pocket costs for labor and materials furnished in the course of performing its subcontract caused by contractor or government delay.[13] The Pertun court focused, as we do, on the purpose and language of the Miller Act and found the surety liable for out-of-pocket costs of delay, a holding consistent with both facets of our emphasis. Id. The Eleventh Circuit reasoned that the "purpose of the statute--to afford the subcontractor the financial protection of an action against the surety--[can only] be achieved" by permitting a subcontractor to recover for all costs of labor and material supplied in performing its contractual obligations, "including those portions caused by delay." Id. The inadequacy of the subcontractor's other options, either bearing the costs of delay itself or pursuing a contract action against the contractor, motivated Congress to provide an alternative to "assure full payment for labor and materials actually supplied to a federal project." Pertun, 918 F.2d at 918.
 
 
 17
 In Pertun the contractor contracted with the Navy to construct improvements at the Reserve Training Center in Miami and secured the requisite Miller Act payment bond from its surety. The contractor subcontracted the concrete work to a subcontractor. Various problems, including the discovery of toxic wastes and the lack of running water and electricity on site, delayed the beginning of work on the project. Once construction started, the contractor's failure to schedule and supervise its subcontractors' work translated into additional delays. The contractor wrongfully terminated the subcontract before the subcontractor completed its work and refused to allow the subcontractor to return to the construction site to finish work or collect its tools and equipment.
 
 
 18
 The district court granted the subcontractor recovery against the surety for work in place, the value of equipment and material retained by the contractor and incorporated in the project, and increased costs of labor and equipment rentals caused by the delay. Pertun, 918 F.2d at 917. The Eleventh Circuit, affirming the district court's judgment holding the surety liable for extra out-of-pocket expenses, characterized the Subcontractor's actual outlays for labor and material furnished in the performance of the contract, including "additional or increased expenditures caused by delay," not as damages for breach of contract, but as recoverable " 'sums justly due' " the Subcontractor within the meaning of the Miller Act. Pertun, 918 F.2d at 919 (quoting 40 U.S.C.A. § 270b(a) (1986)).
 
 
 19
 We agree with the reasoning of the Eleventh Circuit and thus hold that the district court erred in concluding that none of the components of TMS's Delay Claim were recoverable against the Miller Act surety. We stress, however, that the subcontractor can only recover from the surety for additional or increased costs actually expended in furnishing the labor or material in the prosecution of the work provided for in the contract and attributable to the delay.[14] We limit the surety's liability, in the Eleventh Circuit's words, to the subcontractor's "out-of-pocket costs of delay."[15] Pertun, 918 F.2d at 918.
 
 
 20
 Our decision in United States ex rel. Edward E. Morgan Co. v. Maryland Casualty Co., 147 F.2d 423 (5th Cir.1945), bolsters our conclusion. In Morgan we considered whether the claimed expense attributable to delay, the use value of the subcontractor's own equipment kept idle on the job, constituted "labor or material" within the meaning of the Miller Act and the payment bond. Id. at 425. In that case, a subcontractor appealed from summary judgment dismissing its complaint seeking recovery on a surety bond for the use value of its own equipment, which had remained idle for thirty-one days at the work site. Morgan, 147 F.2d at 424. The prime contractor had subcontracted certain work on a government project to the subcontractor and filed a Miller Act bond with its surety. The subcontracted work involved two stages. When the subcontractor finished work on the first stage, the contractor forbid the subcontractor from moving its "heavy and expensive" equipment to begin work on the second stage, which "left a larger part of the subcontractor's equipment, and all of the larger and heavier pieces, idle." Id. A third party, not the contractor, caused the work stoppage.
 
 
 21
 We held in Morgan that the use value of the subcontractor's own equipment for the period of delay did not constitute "labor or material" within the meaning of the Miller Act. Morgan, 147 F.2d at 425. Unlike cases allowing subcontractors to recover against Miller Act sureties for costs caused by delay, the use value of the subcontractor's own equipment in Morgan was neither "necessary for the performance of the contract," nor "within the contemplation of the parties" to the contract. Id. Rather, the claim resembled one for damages for breach of contract; we declined to permit recovery against the surety for damages for breach of contract by the government or the contractor. Id. As explained by the Eleventh Circuit, the "use value of its own equipment sought by the Morgan subcontractor is far more analogous to lost profits--for which recovery against the surety is not allowed--than to actual expenditures for labor or materials utilized in the performance of the subcontract--for which [recovery] is allowed." Pertun, 918 F.2d at 919.
 
 
 22
 Our holding in this case and in Morgan thus necessitates the corresponding conclusion that a subcontractor cannot recover from a Miller Act surety the profits on out-of-pocket expenditures attributable to delay. A claim for profit does not involve actual outlay and thus "falls outside both the letter and the spirit of the [Miller] Act." United States ex rel. Otis Elevator Co. v. Piracci Construction Co., 405 F.Supp. 908, 910 (D.D.C.1975) (holding that although subcontractor could recover out-of-pocket expenditures attributable to delay, subcontractor could not recover from surety for profit of ten percent of direct and indirect additional costs); see Pertun, 918 F.2d at 919. While we hold that additional or increased out-of-pocket expenses attributable to the delay are recoverable against the Miller Act surety, we find that profit on the actual outlay, like the use value of a subcontractor's own equipment, is neither "necessary for the performance of the contract," nor "within the contemplation of the parties."[16] Morgan, 147 F.2d at 425.
 
 B. Partial Termination
 
 23
 TMS asserts that the Government's partial termination of the Contract for its convenience and Craftsmen's subsequent termination of the Subcontract resulted in significant costs to TMS.[17] TMS contends that the district court erred by concluding that TMS could not recover from the Miller Act surety on the payment bond for its Termination Claim. We hold that the district court correctly denied recovery on TMS's Termination Claim because the components of the claim did not constitute "labor or material [furnished] in the prosecution of the work provided for in [the] contract." 40 U.S.C.A. § 270b(a) (1986). Despite our liberal interpretation of the Miller Act, we remain constrained by the language of the legislation. We agree with the district court's conclusion that the components comprising the Termination Claim are, "by definition ... attributable to elements other than work in furtherance of the Contract as the Contract had already been terminated."
 
 
 24
 Moreover, the language of the Contract buttresses our holding that a subcontractor cannot recover on a Miller Act payment bond for the cost of labor and materials provided after the termination of work under a government construction project. The Contract provision entitled "Termination for Convenience of the Government" incorporated 48 C.F.R. § 52.249-2 (1984) of the Federal Acquisition Regulations ("FAR"),[18] which outlines the duties of the parties upon government termination and includes procedures for making termination claims. Under the FAR, a "subcontractor may have rights against the prime contractor ... with whom it has contracted. Upon termination of a prime contract, the prime contractor and each subcontractor are responsible for the prompt settlement of the settlement proposals of their immediate subcontractors." 48 C.F.R. § 49.108-1 (1984); see also 48 C.F.R. § 49.108-1 to .108-8 (1984) (outlining procedure for settlement of subcontractor settlement proposals).
 
 III. CONCLUSION
 
 25
 For the reasons stated in this opinion, we REVERSE in part, AFFIRM in part, and REMAND for further proceedings in accordance with this opinion.
 
 
 
 [1]
 In relevant part, 40 U.S.C.A. § 270a(a) provides that
 [b]efore any contract, exceeding $25,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person.... (2) A payment bond with a surety or sureties satisfactory to such officer [awarding the contract] for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person.
 
 
 [2]
 The district court found that the Government partially terminated the Contract for its own convenience, not because of a default on the part of Craftsmen, the contractor
 
 
 [3]
 This Court granted TMS's motion to sever for purposes of proceeding against the non-bankrupt appellee, Millers, on February 6, 1991
 
 
 [4]
 Pursuant to an Indemnity Agreement executed in favor of Millers, Millers filed a third party complaint against Craftsmen, Joseph Breedlove, J.D. Richmond, Jr. and Doris Richmond ("Indemnitors"), seeking indemnity for all costs, fees, and expenses incurred because of its issuance of the payment bond. The Indemnitors agreed to an entry of judgment of indemnity against them for the $176,190.89 previously paid by Millers to TMS, plus $100,104.19 awarded to TMS on its contract work claim against Millers, $20,000.00 attorney's fees, and $18,018.75 in pre- and post-judgment interest
 
 
 [5]
 Jurisdiction was correctly based on 40 U.S.C. § 270b(a) in the district court and on 28 U.S.C. § 1291 in this Court
 
 
 [6]
 We briefly dispose of the issues raised by Millers in its cross-appeal. First, the "pay-when-paid" clause in the Subcontract does not preclude TMS's recovery on its contract work and change order claim because under the Miller Act, the liability of the contractor is to the subcontractor, despite non-payment by the government to the contractor. See Fanderlik-Locke Co. v. United States ex rel. Morgan, 285 F.2d 939, 942 (10th Cir.1960) ("ordinarily the fact that a prime contractor has a claim for the same amounts pending under the 'disputes clause' of the prime contract, does not affect Miller Act cases"), cert. denied, 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 823 (1961). The federal legislation conditions payment of the subcontractor not on payment by the government to the contractor, but rather on the passage of time from completion of the work or provision of materials. F.D. Rich Co., Inc. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974) (scope of remedy and substance of rights created under Miller Act are matters of federal, not state, law); see 40 U.S.C.A. § 270b(a) (1986)
 Second, Craftmen's alleged failure to notify Millers of "material alterations" to the Contract fails to discharge Millers from its liability on the Bond because Millers waived notice of "duly authorized modifications" of the Contract in the Bond. See infra note 8.
 Third, because we will reverse an award of costs "only on a clear showing of abuse of discretion," we affirm the district court's award of costs to TMS. Fogleman v. Arabian Am. Oil Co., 920 F.2d 278, 285 (5th Cir.1991) (citation omitted).
 
 
 [7]
 40 U.S.C.A. §§ 270a-270f (1986). The Miller Act replaced the Heard Act in 1935. United States ex rel. Texas Bitulithic Co. v. Fidelity and Deposit Co., 813 F.2d 697, 699 (5th Cir.1987). For a discussion of the legislative changes, not relevant to this case, see Bernard L. Balkin, Recovery of Damages for Delay Against Sureties on Public Works Bonds, 20 Forum 650, 644-45 (1987)
 
 
 [8]
 Under the Bond secured by Craftsmen, "if the Principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract and any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the Surety being hereby waived, then the ... obligation shall be void and of no effect."
 
 
 [9]
 See Standard Accident Ins. Co. v. United States ex rel. Powell, 302 U.S. 442, 444, 58 S.Ct. 314, 315, 82 L.Ed. 350 (1938) (Court "committed to the doctrine that [the Act] should be liberally construed in aid of the evident public object--security to those who contribute labor or material for public works."); United States ex rel. Hill v. American Surety Co., 200 U.S. 197, 203, 26 S.Ct. 168, 170, 50 L.Ed. 437 (1906) ("But we must not overlook, in construing this obligation, the manifest purpose of the statute to require that material and labor actually contributed to the construction of the public building shall be paid for, and to provide a security to that end.")
 
 
 [10]
 The district court found that TMS entered into the Subcontract with Craftsmen, which entitled it to seek recovery on the Bond for the amount allegedly unpaid at the time it brought suit
 
 
 [11]
 TMS filed its complaint within "one year after the day on which the last of the labor was performed or material was supplied by [it]." 40 U.S.C.A. § 270b(b) (1986)
 
 
 [12]
 TMS asserted that the delay resulted in the following costs, totalling $467,738.00: 1) direct project overhead, including overhead labor (salaries for supervisory personnel, laborers, and a secretary, plus 40% of the salary expense for "decreased efficiency for demobilization and remobilization" and 28.76% of the salary amount for "labor burden") and expenses (offices, buildings, trailers, vans, trucks, equipment, tools, utilities, housing rental, fuel, subsistence, insurance, postage, pulmonary tests on employees, and copy charges from increased paperwork); and, 2) indirect project overhead, including accounting and attorney fees, amounts paid to settle sub-subcontractors' delay claims, general project overhead figured at 21.19% of all items listed above, and profit of 20% on all items listed above, including general project overhead (collectively, "Delay Claim")
 
 
 [13]
 Pertun relied on the logic of three cases considering similar claims under the Miller Act: United States ex rel. Heller Electric Co. v. William F. Klingensmith, Inc., 670 F.2d 1227 (D.C.Cir.1982); United States ex rel. Otis Elevator Co. v. Piracci Constr. Co., 405 F.Supp. 908 (D.D.C.1975); and United States ex rel. Mariana v. Piracci Constr. Co., 405 F.Supp. 904 (D.D.C.1975). Pertun, 918 F.2d at 918. We agree with the reasoning of those cases
 We find the rationale underlying Mariana, the most instructive of the three decisions, quite persuasive. The court held that a Miller Act surety is liable to a subcontractor for increased costs for labor or material furnished " 'in the prosecution of the work provided for in [the] contract,' " provided that the costs were actually incurred due to delay not attributable to the subcontractor. Mariana, 405 F.Supp. at 906. The court reasoned and we agree that the subcontractor's claims fell "within the literal language of the statute" because the outlays were "for labor or materials that were furnished and used by the subcontractor in performing his contractual obligations"; the recovery "afford[ed] the subcontractor the financial protection of an action against the surety" and thus "promote[d] the underlying purpose of the Miller Act"; and, finally, the principle of unjust enrichment forms the basis of both a mechanic's lien and a Miller Act lien and favors compensating " 'those whose actual expenditure of work or utilization of material has enhanced the value of the property in question.' " Mariana, 405 F.Supp. at 906-07 (citing Arthur N. Olive Co. v. United States ex rel. Mariano, 297 F.2d 70, 72 (1st Cir.1961)).
 
 
 [14]
 A subcontractor cannot recover from a Miller Act surety for additional or increased costs caused by its own delay. Mariana, 405 F.Supp. at 906, 907; see United States ex rel. Superior Insulation Co. v. Robert E. McKee, Inc., 702 F.Supp. 1298, 1301 (N.D.Tex.1988)
 
 
 [15]
 We endorse the Mariana court's view that a subcontractor "must be able to demonstrate with reasonable certainty and specificity the increased costs resulting from the delay.... particularly ... with respect to the claim for home office overhead and general and administrative expenses." Mariana, 405 F.Supp. at 907 n. 7; Otis Elevator, 405 F.Supp. at 909 n. 1
 
 
 [16]
 The Subcontract here, as in Mariana and Otis Elevator, contemplated payment to the subcontractor for increased costs of performance caused by suspensions, delays or interruptions of the contract work for the convenience of the government. Otis Elevator, 405 F.Supp. at 910 (referencing "revised standard government contract"). The Subcontract provision excluded any recovery for profit, however
 
 
 [17]
 TMS claimed the following items as termination costs, totalling $203,430.00 after Millers paid TMS $48,150.00 for the segment of the claim attributable to "metals": 1) "other costs," including labor, salary for supervisor, living expenses for supervisor, trailers, vans, extended insurance, and software design; 2) general project overhead figured at 21.19% of all items listed above; 3) profit of 20% on all items listed above, including general profit overhead; 4) "settlement expenses"; and 5) amounts paid to settle suppliers' claims (collectively, "Termination Claim")
 
 
 [18]
 Paragraph 18 of the Contract fully incorporated the "clause in Section 1-8.703 of the Federal Procurement Regulations ... in effect on the day of this Contract...." The Federal Acquisition Regulations System codified at chapter one of Title 48 of the Code of Federal Regulations, however, replaced the Federal Procurement Regulations System for civilian contracts, chapters one through forty-nine of Title 41, for all contracts entered into after FAR's April 1, 1984 effective date. 50 Fed.Reg. 26,98 7-02 (1985). Because of the April 5, 1984 Contract date, the Court hereinafter references 48 C.F.R. § 52.249-2 of FAR, the substantive equivalent of 41 C.F.R. § 1-8.703