**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-1160**

───────────────

UNITED STATES EX REL. ELLIOT DICKSON, P. E.; ELLIOT H. DICKSON, P. E.,

                Plaintiffs - Appellants,

     v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND,

                Defendant - Appellee,

FORNEY ENTERPRISES, INC.; ZURICH AMERICAN INSURANCE COMPANY; COLONIAL AMERICAN CASUALTY AND SURETY COMPANY,

                Defendants.

───────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge. (1:20-cv-00129-CMH-JFA)

───────────────

Argued:  March 8, 2022                    Decided:  April 26, 2023

───────────────

Before AGEE and RICHARDSON, Circuit Judges, and FLOYD, Senior Circuit Judge.

───────────────

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Agee joined.  Senior Judge Floyd wrote a dissenting opinion.

───────────────

**ARGUED:**  C. Thomas Brown, SILVER & BROWN, Fairfax, Virginia, for Appellants. Dominick Preston Weinkam, WATT, TIEDER, HOFFAR & FITZGERALD, LLP,

McLean, Virginia, for Appellee. **ON BRIEF:** Erik B. Lawson, SILVER & BROWN, Fairfax, Virginia, for Appellants.

_____

RICHARDSON, Circuit Judge:

Under the Miller Act, contractors hired to work on government projects are required to furnish bonds to pay those who provided labor and were not paid as a result of a dispute. But not all work on a government project qualifies as "labor" under the Miller Act, 40 U.S.C. §§ 3131–34. And even when the work qualifies as labor, to claim his piece of the bond, a laborer must sue within one year of completing the labor to recover.

Elliott Dickson was a subcontractor for Forney Enterprises, a contractor working for the Pentagon. Forney Enterprises was bonded through the Fidelity and Deposit Company of Maryland. Dickson worked as a project manager for Forney Enterprises, supervising others who engaged in manual labor. After Forney Enterprises' work at the Pentagon was terminated, Dickson sued Fidelity to recover the value of the work he had not been paid for.

The district court found that his supervisory work did not qualify as "labor" and granted summary judgment for Fidelity. While we find much of Dickson's work was "labor," the only work he performed within one year of filing suit, a materials inventory, was not "labor." And no circumstances warrant estopping Fidelity from asserting the statute of limitations. So we affirm the district court.

## I.      Background

The Department of Defense hired Forney Enterprises as the prime contractor to renovate several staircases at the Pentagon and their accompanying fire suppression systems. Forney Enterprises then subcontracted with Elliott Dickson, a professional engineer, to work as a project manager on that contract, starting in 2015. The bulk of

3

Dickson's work focused on supervising labor on the site. But Dickson performed many other tasks, including logistical and clerical duties, taking various field measurements, cleaning the worksite, moving tools and materials, and sometimes even watering the concrete himself. This work required Dickson to be at the project site almost daily.

Forney Enterprises' work at the Pentagon involved 10 separate stair complexes. In December 2018, a Defense subagency terminated its contract with Forney Enterprises for "failure to prosecute the work with . . . diligence." J.A. 140. The agency directed Forney Enterprises to stop all work, except for the work on staircases 1 and 2, and cleaning up the worksite. The agency gave Forney Enterprises a January 31, 2019 deadline to complete the work on staircases 1 and 2. The government also ordered Forney Enterprises to submit a materials inventory by February 11, 2019, so it could reimburse some of Forney's costs. Dickson conducted this on-site inventory on February 8, 2019, the last day he was on the project site.

Under the Miller Act, Forney Enterprises was required to furnish the government with two surety bonds: a performance bond "for the protection of the Government" and a payment bond "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract." *See* 40 U.S.C. § 3131(b). Forney Enterprises secured Fidelity and Deposit Company of Maryland to issue those bonds. On January 10, 2019, Dickson submitted a claim to Fidelity for about $400,000 for his work on the project. On January 14, 2020—more than a full year later—Fidelity denied the claim, largely because Dickson failed to provide evidence that he had performed "labor" as required for recovery under the Miller Act. J.A. 412. The letter expressed Fidelity's desire to "work

4

with [Dickson] in a cooperative manner to reach a practical resolution" to Dickson's claim. J.A. 412. Fidelity then asked Dickson to resubmit his Proof of Claim, asserting that Dickson needed to remove from his claim "all hours worked off-site, as well as those performed on-site relating to clerical and administrative tasks." J.A. 412. The letter stated that "[o]nce the Surety has received your revised Proof of Claim, it will conduct another review to determine any amounts recoverable under the Payment Bond." J.A. 412. The letter made sure to "reserve[ ] all rights." J.A. 412.[1]

Dickson never submitted a revised Proof of Claim, and instead, on February 5, 2020—less than a month after Fidelity rejected his claim—sued Fidelity for recovery under the Miller Act. He claimed that his work qualified as "labor" and he had a right to recover, and that even if he sued outside the statute of limitations period, he did so based on reasonable reliance on the letter from Fidelity urging him to refile his claims. The district court granted summary judgment for Fidelity, holding that Dickson's work did not qualify as "labor" for Miller Act purposes, on a theory that supervisory work is generally not "labor." The court found that "any de minimis physical work by Plaintiff was merely incidental to his contractual duty to supervise." J.A. 2894. The court also held that even if Dickson's supervisory work qualified as labor, the project concluded on January 31, 2019, and the later inventory was a "clerical task" that did not fall within the definition of

---

[1] A previous communication from Fidelity to Dickson made similar reservations: "Our actions are taken for the purposes of investigation only, and the Surety reserves all rights and defenses . . . . Nothing stated or unstated in this or any other correspondence is intended or should be construed as an acknowledgment of liability . . . or as a waiver of any right or defense . . . ." J.A. 389–90.

labor under the Miller Act. J.A. 2896.[2] Finally, the court held that there were no grounds for estopping Fidelity from asserting the statute of limitations because the letter sent to Dickson was merely a promise to investigate, that a promise to investigate cannot cause reasonable reliance, and that, even if it could, the previous communications reserving all defenses meant Dickson could not have reasonably relied on the letter to delay litigation. Dickson timely appealed.

## II.    Discussion

The district court granted summary judgment to Fidelity. We review a grant of summary judgment de novo, applying the same standard the district court applied and viewing the facts in the light most favorable to the nonmoving party. *See Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 817 (4th Cir. 1995). Summary judgment is appropriate only when no genuine disputes of material fact exist, and the movants are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A.    The Miller Act and The Heard Act

Before turning to what counts as "labor" under the Miller Act, some context will be useful. Contractors, subcontractors, and workers often perform work on construction projects only to be paid later. This set-up creates a risk that an owner or a contractor won't pay up. At common law, unpaid construction workers had few effective options to recover for the value of their labor. *See* Chas. E. Davidson, *The Mechanic's Lien Law of Illinois* 6–7 (1922). In the late 1700s, the risk of nonpayment caused a shortage of construction

---

[2] The district court separately held that the inventory was "a post-project task and thus not recoverable under the Miller Act." J.A. 2896.

6

workers, resulting in a housing crisis in Washington, D.C. *Id.* at 6. In 1791, Thomas Jefferson proposed a "mechanic's lien" statute to solve the problem. *Id.* The mechanic's lien allowed unpaid workers to place something like a common-law lien—but significantly harder to avoid—on the property they worked on, thereby insuring them against getting stiffed by the owner.

The mechanic's lien is a solution in many cases, but not here. A "lien cannot attach to Government property," so a different solution was needed for builders and laborers working on government projects. *J. W. Bateson Co. v. United States ex rel. Bd. of Trs. of The Nat'l Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 589 (1978) (quoting *F. D. Rich Co. v. U. S. for Use of Indus. Lumber Co.*, 417 U.S. 116, 122 (1974)). To protect those workers, Congress passed the Heard Act, ch. 280, 28 Stat. 278 (1894), which was eventually replaced by the Miller Act, Pub. L. No. 74-321, 49 Stat. 793 (1935) (codified as amended at 40 U.S.C. §§ 3131–34).

Under the Miller Act, like the Heard Act before it, a primary contractor working on a government project must furnish a bond which can be used later to pay subcontractors, laborers, and materials providers. *See* George Fiedler, *The Heard Act and the Miller Act After Fifty Years*, 12 Ins. Couns. J. 22, 23–24 (1945). Typically, a bond is furnished through a surety company, and unpaid subcontractors or workers can sue the surety company to collect the money they are owed. But a bond issued under the Miller Act does not cover *all* the money that might be owed for the project. Instead, the Miller Act retained the Heard Act's requirement that a bond need only cover "labor" and "materials." Dickson alleges that his work constituted labor under the Miller Act.

**B.    Miller Act "labor"**

The Miller Act requires any contractor working on a government project worth more than $100,000 to supply a bond "for the protection of all persons supplying labor." § 3131(b)(2).  For any person who "has furnished labor . . . provided for in a contract" and who "has not been paid in full within 90 days after the day on which the person did or performed the last of the labor," the Miller Act provides a cause of action to pursue reimbursement through the bond.  § 3133(b)(1).

While published caselaw interpreting the word "labor" under the Miller Act is sparse, courts have largely agreed that tasks involving "physical toil" are labor and that on-site supervision of "physical toil" is also labor.  *See Luong v. W. Sur. Co.*, 485 P.3d 46, 51–52 (Alaska 2021) (collecting cases); *see also United States ex rel. Barber-Colman Co. v. U.S. Fid. & Guar. Co.*, No. 93-1665, 1994 WL 108502, at *3 (4th Cir. 1994) (per curiam) (unpublished); *United States ex rel. Constructors, Inc. v. Gulf Ins. Co.*, 313 F. Supp. 2d 593, 597 (E.D. Va. 2004).

Those two ideas—that "labor" requires physical toil, and that on-site supervision of physical toil is itself "labor"—trace to the Miller Act's predecessor, the Heard Act.  The federal courts (including our own circuit) interpreted "labor" under the Heard Act to require physical toil, or its direct supervision.  Because the Miller Act copied this "labor" language directly from the Heard Act, we apply our construction of Heard Act "labor" to the same language today.

In a sense, our Court has already answered the question before us.  Over a hundred years ago, in *Bankers' Surety Co. of Cleveland v. Maxwell*, 222 F. 797 (4th Cir. 1915), we

8

considered what "labor" meant under the Heard Act. We asked whether the act of supervising workers, who were themselves engaged in bodily toil and physical exertion, qualified as labor. *Maxwell*, 222 F. at 799–800. And we determined that the supervisor in *Maxwell* did indeed engage in "labor," since he "was employed as a working foreman," and actually performed physical labor alongside his workers. *Id.* at 800. Thus, the best reading of our decision in *Maxwell* is that "labor" under the Heard Act must be physical. Supervisory work is fine, since it often involves a physical component. Yet mental labor alone, such as clerical or administrative tasks, does not suffice.

True, *Maxwell* does not say all of this explicitly. But its extended focus on physical labor would make little sense otherwise. Supervising workers always involves mental labor. If the *Maxwell* court believed that mental labor alone was sufficient, why spend so much time discussing whether that specific supervisor's labor was physical? Courts of long ago often dispensed with cases in a few short paragraphs. While that has real benefits, one downside is that those courts did not make every premise explicit. We must read between the lines. And one clear premise permeates *Maxwell*: "labor" means "physical labor."

*Maxwell*'s reliance on an earlier Supreme Court case, *Mining Co. v. Cullins*, 104 U.S. 176 (1881), bolsters this reading. *Cullins* asked what a state mechanic's lien statute meant by "labor." 104 U.S. at 177–78. And *Maxwell*'s analysis about what constitutes Heard Act "labor" relies heavily upon one long quotation from *Cullins*. *See Maxwell*, 222 F. at 799 (quoting *Cullins*, 104 U.S. at 177–78). In that quoted section, the Supreme Court explicitly drew a line between work "of a professional character," which is not covered as

9

"work and labor" under the statute, and "manual labor," which is covered. *Cullins*, 104 U.S. at 177; *see id.* at 179 ("It is somewhat difficult to draw the line between the kind of work and labor which is entitled to a lien, and that which is mere professional or supervisory employment, not fairly to be included in those terms."). Granted, *Cullins* declined to precisely define where that line fell, since the plaintiff there—a direct supervisor of workers—was clearly on the "physical" side of the line. *Id.* at 178 (noting that because the supervisor's services "may well be called work and labor" themselves, and, "occasionally in an emergency, . . . [he must] assist with his own hands," that supervisor engages in "[b]odily toil," and thus "labor" that is covered by the statute). But drawing that line shows that the Court thought "labor," as used in the state statute, required a physical component.

This federal interpretation that "labor" requires physical toil was not uniformly followed by state courts interpreting that term in their own mechanic's lien statutes. Indeed, whether "labor" could be purely mental bitterly divided states in the late 19th and early 20th centuries. Some states held that mental toil qualified as "labor" under their state statutes. *See, e.g.*, *Stryker v. Cassidy*, 76 N.Y. (31 Sickels) 50, 53–54 (1879); *Knight v. Norris*, 13 Minn. 473, 475–76 (1868); *see also Field & Slocomb v. Consol. Min. Water Co.*, 55 A. 757, 758 (R.I. 1903) (collecting cases). Other states held that mental toil alone was not enough. *See, e.g.*, *Mitchell v. Packard*, 47 N.E. 113, 114–15 (Mass. 1897); *Price v. Kirk*, 90 Pa. 47, 48–49 (1879) (per curiam); *Brockway v. Innes,* 39 Mich. 47, 48 (1878). The Supreme Court, in *Cullins*, sided with the latter group of states requiring physical toil.

10

And *Cullins* is where we turned in *Maxwell* when deciding what the Heard Act meant by "labor."

Our Court in *Maxwell* was not alone in interpreting Heard Act "labor" to require a physical component. Indeed, to our knowledge, the only other federal appellate court to consider what counts as Heard Act "labor" seemed to take the same position. Like our circuit, the Fifth Circuit held that a direct supervisor of workers could furnish "labor" under the Act. *See Am. Sur. Co. of N.Y. v. United States ex rel. Barrow-Agee Lab'ys*, 76 F.2d 67, 68 (5th Cir. 1935). In doing so, it assumed that "the term 'labor' in [the Heard Act] . . . refers to physical labor rather than technical and professional skill and judgment." *Id.* Citing both *Maxwell* and *Cullins*, the Fifth Circuit noted that direct supervisors often engage in "manual labor" themselves. *Id.* So, like our Court, the Fifth Circuit held that this "hard physical labor" meant that the supervisor was covered by the Heard Act. *Id.*

This view of "labor" was not limited to the Heard Act. During the same period, in *Church of the Holy Trinity v. United States*, 143 U.S. 457 (1892), the Supreme Court also considered the meaning of "labor" under our immigration statutes. There, the Court explained that "labor"—this time used in the Alien Contract Labor Law—extended "only to the work of the manual laborer, as distinguished from that of the professional man." [3]

---

[3] *Holy Trinity* is best known for its role in the broader statutory interpretation debate between purposivists and textualists. *See* Antonin Scalia, A Matter of Interpretation 18 (1997); *compare also Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 107 & n.3 (2007) (Stevens, J., concurring) *with id.* at 108, 116–17 (Scalia, J., dissenting). We cite it today for a much more limited proposition: that the Supreme Court of the 1890s understood the word "labor" to include physical, but not purely mental, toil.

11

143 U.S. at 463. Although in a different statutory context, the Supreme Court in *Holy Trinity* used a definition for "labor" that tracked both *Cullins* and *Maxwell*, a mere two years before Congress passed the Heard Act.

A clear picture thus emerges from the fog. Although the states were divided about whether purely mental toil constituted "labor" under their various mechanic's lien statutes, the Supreme Court held in *Cullins* that it did not. The only circuits to consider this question under the Heard Act adopted *Cullins*'s logic, reasoning that "labor," as used in that statute, required a physical component. They never suggested that purely mental "labor" was enough.

Dickson, of course, isn't suing under the Heard Act. He's suing under the Miller Act. And the Miller Act replaced the Heard Act in 1935. So we must consider how "labor" in the Miller Act would have been understood in 1935.

But we do not start on a blank slate. Instead, we must take stock of the Miller Act's context: Congress copied the disputed provision of the Miller Act directly from the Heard Act. When a statute's language is "obviously transported from another legal source, whether the common law or other legislation, it brings the old soil with it." *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)).[4] Here, the "old soil" giving legal meaning to the Miller Act is the Heard Act.

---

[4] *See Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019); *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018).

What this means is that a reader of the Miller Act in 1935 would have connected it to the Heard Act. So a 1935 inquiry about what "labor" meant under the Miller Act would be informed by how courts interpreted "labor" under the Heard Act. And, in the Fourth Circuit, the reader would have found that *Maxwell* answers this question: "labor" under the Heard Act must be physical. *See* 222 F. at 799–800. If any lingering doubts remained, they would have been assuaged by the fact that the only other federal appellate court to consider the question agreed with *Maxwell*. *See Barrow-Agee*, 76 F.2d at 68. Indeed—as far as this Court is aware—no published decision existed that interpreted this part of the Heard Act differently.[5] Add to this the Supreme Court's consonant decisions in *Cullins* and *Holy Trinity*, and a reader of the Miller Act would have understood that "labor" requires a physical component.

Perhaps the result would be different if Congress had infused "labor" with new meaning when it passed the Miller Act. Then, it might not make sense to trace "labor" back to the Heard Act. But this did not happen.

To start, while the Miller Act "repealed" the Heard Act, *see* Miller Act, 49 Stat. at 794, § 5 (1935), it did so only technically. Congress passed the Miller Act as the direct

---

[5] To be clear, there are plenty of cases that discuss related questions under the Heard Act. For instance, what counts as a "public work" under the act? *See, e.g.*, *Title Guar. & Tr. Co. of Scranton v. Crane Co.*, 219 U.S. 24, 32–33 (1910). What does the act mean by "materials," and what does it mean for the labor and materials to be supplied "in the prosecution of" the public work? *See, e.g.*, *Title Guar. & Tr. Co. of Scranton v. Puget Sound Engine Works*, 163 F. 168, 179 (9th Cir. 1908) *aff'd sub nom. Crane Co.*, 219 U.S. 24; *United States ex rel. Watsabaugh & Co. v. Seaboard Sur. Co.*, 26 F. Supp. 681, 689–92 (D. Mont. 1938) (collecting cases). But these cases do not address our question: must "labor" under the Heard Act involve a physical component?

13

successor to the Heard Act, *Bateson*, 434 U.S. at 589, and it "reinstated [the Heard Act's] basic provisions," *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Thompkins Co.*, 322 U.S. 102, 105 (1944). The new act "was designed primarily to eliminate certain *procedural* limitations on its beneficiaries," not to expand the scope of those beneficiaries. *Id.* (emphasis added). The Miller Act's changes thus focused mostly on the *procedures* that workers had to follow in order to make claims. Yet, like the Heard Act before it, the Miller Act continued to limit its coverage to people who supplied "labor" or "materials" in the construction of a public work, and the relevant provisions containing those terms remained identical between the two acts. There is no sign that Congress broadened the Miller Act's scope beyond that of the Heard Act by mechanically repeating its terms. Quite the opposite.

What's more, it is far from clear that the meaning of "labor" had changed between 1894 and 1935. Throughout this period, state courts engaged in a vigorous debate about the scope of "labor" in their state mechanic's lien statutes. Contemporary dictionaries, rather than resolving this debate, simply reflected it. Dictionaries at the time of the Heard Act were split, some defining labor as limited to physical toil, others including mental toil in their definition, and still others acknowledging both the narrower and broader definitions as distinct senses of the word.[6] This split continued through the time that the Miller Act

---

[6] For an example that limits labor to the physical context, *see Labor*, Black's Law Dictionary (1st ed. 1891) ("Continued exertion, of the more onerous and inferior kind, usually and chiefly consisting in the protracted expenditure of muscular force, adapted to the accomplishment of specific useful ends."). But for examples of definitions including both physical and mental labor, *see Labor*, Bouvier's Law Dictionary, vol. II (1897) (Continued)

14

was drafted.[7]  At bottom, there is no reason to think that—even if we were to ignore the meaning "labor" had under the Heard Act—its ordinary meaning in 1935 would have been broader than in 1894.

In any case, dictionaries do not provide a definitive answer here.  The point is not that labor *could theoretically* be understood expansively to include mental exertion.  It is that a reader of the Miller Act would not have understood it that way.  And conflict in the state courts or dictionaries does not change that fact.

### C.     Dickson's "labor"

With this understanding of "labor" in mind, we turn to Dickson's claims.  The district court first held that Dickson's supervisory work did not qualify as "labor."  We disagree.  The bulk of Dickson's work involved both direction and supervision of manual labor and occasional performance of manual labor and therefore qualifies as "labor."  And

---

("Work requiring exertion or effort, either physical or mental."); *Labor*, Universal Dictionary of the English Language, vol. III (1897) (including "[t]he act of doing, or endeavoring to do, that which involves hard work, toil, or exertion of strength, whether physical or mental").  Finally, for examples noting both as distinct definitions, *see Labor*, Webster's Collegiate Dictionary (1898) (including "[p]hysical toil or bodily exertion" and "[i]ntellectual exertion; mental effort"); *Labor*, The Century Dictionary and Cyclopedia, vol. IV (1899) (including "exertion of body or mind, or both, for the accomplishment of an end" and "the use of muscular strength for the satisfaction of wants, in distinction from purely mental exertion").

[7] *Compare, e.g.*, *Labor*, Black's Law Dictionary (3d ed. 1933) (retaining its narrower definition of labor, which it claimed was the meaning usually used in state "statutes giving liens to laborers" and in the federal Immigration Act, but also noting the term "is sometimes given a broader meaning as [i]ncluding all bodily or intellectual exertion done for a purpose other than pleasure"), *and Labor*, Law Dictionary with Pronunciations (1930) ("Physical toil."), *with Labor*, Bouvier's Law Dictionary (1934) (retaining its broad definition), *and Labor*, Webster's New International Dictionary (2d ed. 1934) ("Physical or mental toil.").

this supervisory work continued until no later than January 31, 2019.  *See* J.A. 143 (directing Forney Enterprises "to continue work on [staircases] 1 & 2 on the condition the work . . . is fully complete . . . no later than 31 Jan 2019").  Thus we hold that Dickson's supervisory work through January 2019 was Miller Act "labor."

While the district court erred in finding that Dickson's supervisory work was not "labor" under the Miller Act, the district court alternatively held that the statute of limitations barred his claim.  And on this point, we agree.

The statute of limitations runs "one year after the *day on which the last of the labor was performed*."  § 3133(b)(4) (emphasis added).  Dickson's supervision of other workers was last performed more than one year before suit was filed.  The only on-site work Dickson completed within one year of filing suit was taking a final inventory on February 8, 2019.[8]  Dickson's final inventory did not involve any supervisory work, as he did it himself.  So our understanding of the meaning of labor under the Miller Act does not apply to that work.  *See Maxwell*, 222 F. at 799.  The district court found that the inventory work was merely clerical—mostly paperwork with perhaps some manipulation of light pipe— which would not qualify as labor under the Miller Act.  And we agree with the district

---

[8] It is unclear whether the work was "provided for in the contract" because it was performed after the contract was terminated.  *See* § 3131(b)(2); *see also United States ex rel. Magna Masonry, Inc. v. R.T. Woodfield, Inc.*, 709 F.2d 249, 251 (4th Cir. 1983) (holding that follow-up work "correcting defects, or making repairs following inspection" is not work provided for under the contract (quoting *United States ex rel. Noland v. Andrews,* 406 F.2d 790, 792 (4th Cir.1969)); *United States ex rel. T.M.S. Mech. Contractors, Inc. v. Millers Mut. Fire Ins. Co. of Tex.*, 942 F.2d 946, 953 (5th Cir. 1991) ("[A] subcontractor cannot recover on a Miller Act payment bond for the cost of labor and materials provided after the termination of work under a government construction project.").

16

court's conclusion that, based on this record, taking the final inventory of a job site lacks the "physical exertion" and "[b]odily toil" required to qualify as labor. *See id.*

True, Dickson's inventory work may have been "physical" in a broad sense, just as any office work—filing papers, typing on a keyboard, or refilling the printer—involves "physical" acts. But when a law clerk staples the pages of this opinion together, he has not engaged in "physical exertion" or "bodily toil." *Maxwell* and *Cullins* drew a line between work "of a professional character" and "manual labor." *See Cullins*, 104 U.S. at 177; *Maxwell*, 222 F. at 799 (quoting *Cullins*). For that line to mean anything, it is not enough that an act is technically "physical": it must rise to "exertion" or "toil." And Dickson's inventory simply did not.

We thus conclude that Dickson's supervision of laborers constitutes labor under his contract with Forney Enterprises. But that supervision ended no later than January 31, 2019, which is outside the one-year limitations period for Miller Act claims. *See* § 3133(b)(4). The only work done within the one-year period was taking an inventory and that does not count as labor. So unless Fidelity is estopped from asserting the statute of limitations, Dickson's claim must fail.

### D.    Estoppel

Estoppel is an equitable defense based on the principle "that where one party has by his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage." *United States ex rel. Humble Oil & Refin. Co. v. Fid. & Cas. Co. of N.Y.*, 402 F.2d 893, 897 n.3 (4th Cir. 1968). In our

17

Circuit, estoppel does not require unjust or fraudulent conduct by the estopped party, only that "the person estopped, by his statements or conduct, misled another to his prejudice." *Id.* at 898 (quoting *United States ex rel. Noland Co. v. Wood*, 99 F.2d 80, 82 (4th Cir. 1938)). Nonetheless, the reliance must be "unmistakably" foreseeable by the estopped party. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). The reliance of the other party must also be objectively reasonable. *See id.* at 1128–29 ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." (quoting *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984))). And in Miller Act disputes, estoppel "arises where one party by his words, acts, and conduct led the other to believe that it would acknowledge and pay the claim, if, after investigation, the claim were found to be just, but when, after the time for suit had passed, breaks off negotiations and denies liability and refuses to pay." *Humble Oil*, 402 F.2d at 897 (quoting *McWaters & Bartlett v. United States ex rel. Wilson*, 272 F.2d 291, 296 (10th Cir. 1959)).

Here, there was no affirmative indication Fidelity would acknowledge and pay the claim. There were no negotiations or promises to pay. Instead, Fidelity only promised to investigate the claim. Not only did Fidelity not promise to acknowledge and pay the claim, but it repeatedly made clear that its communications were for investigative purposes and reserved all rights and defenses. Fidelity's communications fail to establish equitable estoppel. *See United States ex rel. E. Coast Contracting, Inc. v. U.S. Fid. & Guar. Co.*, 133 F. App'x 58, 60 (4th Cir. 2005) (per curiam). So Fidelity can assert its statute-of-limitations defense, which bars Dickson's recovery.

18

\*      \*      \*

The Miller Act provides a substitute for mechanics' liens for subcontractors working on federal projects, allowing them to recover for the value of their "labor." Under our precedent, Dickson's supervisory work through January 2019 qualified as labor, but his later work taking a final inventory did not. He filed suit more than the one year after his last act of labor, so the Miller Act limitations period barred any claim. And the circumstances that warrant estoppel do not apply here. So Dickson cannot recover. Therefore, the district court must be

*AFFIRMED.*

19

FLOYD, Senior Circuit Judge, dissenting:

The outcome here turns on the meaning of "labor" under the Miller Act, 40 U.S.C. § 3133(a)–(b). My fine colleagues in the majority conclude that an individual only supplies labor under the Miller Act if he or she engages in "bodily toil and physical exertion" or, alternatively, supervises the physical work of others, "since [supervision] often involves a physical component." Majority Op. 9. But because a crucial tenet of the Miller Act is that its reach must be liberally construed, I do not share the majority's view.

As a matter of statutory interpretation, nothing about the term "labor" limits its meaning to *only* "bodily toil and physical exertion," or some other supervision of physical work, as the majority now declares. *Id.* And *Bankers' Surety Co. of Cleveland v. Maxwell*, 222 F. 797 (4th Cir. 1915), on which the majority heavily relies, hardly offers clarity. Furthermore, even if we cabin labor to activity with a physical component, the majority turns a blind eye to the physical nature of Dickson's work on February 8, 2019. Implicit in the majority's logic is that some physical exertion is sufficient under the Miller Act, while other physical exertion falls short. Where we delineate between these categories on a spectrum of physicality is anyone's guess, and the majority's exclusion of Dickson's labor as insufficient leaves us at sea with a polestar of arbitrary judgment.

Unlike the majority, I would first hold that the plain meaning of labor also encompasses "mental exertion." With that conception of labor in mind, I would then hold that Dickson's final inventory, which took place on February 8, 2019, constitutes "labor" under the Miller Act, thus rendering his lawsuit timely. Alternatively, I would hold that Dickson's manipulation of pipe during the inventory process involved sufficient

20

physicality to constitute actionable labor—even under the majority's conception of the term—again, rendering Dickson's lawsuit timely.  At the very least, the degree to which he exerted himself physically while manipulating pipe amounts to a factual question sufficient to preclude summary judgment below.  Thus, I respectfully dissent.

I.

A.

Congress repealed and replaced the Heard Act of 1894 when it passed the Miller Act in 1935.  N. Pieter M. O'Leary, *Bullies in the Sandbox: Federal Construction Projects, the Miller Act, and a Material Supplier's Right to Recover Attorney's Fees and Other "Sums Justly Due" Under a General Contractor's Payment Bond*, 38 Transp. L.J. 1, 6–7 (2011).  "The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection [that] they might receive under state statutes with respect to the construction of nonfederal buildings."  *U.S. ex rel. Sherman v. Carter*, 353 U.S. 210, 216 (1957).  Before a contract exceeding $100,000.00 is awarded for the "construction, alteration, or repair" of a federal building or project, the Miller Act requires contractors to supply the government with both a performance bond and payment bond.  40 U.S.C. § 3131(b)(1)–(2).  The payment bond is for the "protection of all persons supplying labor and material[s]."  *Id.* § 3131(b)(2).  Individuals providing "labor or material[s]" to a project, including subcontractors, may bring a civil action on the payment bond if he or she is not paid in full.  *Id.* § 3133(b)(1)–(2).  The civil action must be initiated "no later than one year after the day on which the last of

21

the labor was performed or material was supplied by the person bringing the action." *Id.* § 3133(b)(4).

## B.

As relevant here, the Miller Act expressly provides:

> Every person that has *furnished labor* . . . in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the *last of the labor* . . . for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought . . . .

*Id.* § 3133(b)(1) (emphases added). In this case, the parties dispute the meaning of "labor" under the Miller Act's express terms. Is labor restricted to physical or manual work—or supervision of such work—as the majority holds? Or does the term contemplate far more?

This is a question of statutory interpretation, so I start with the text. *See United States v. Young*, 989 F.3d 253, 259 (4th Cir. 2021). The Miller Act never defines the word "labor." *See* 40 U.S.C. §§ 3131–34. Nor do any qualifying adjectives—such as "physical," "manual," or even "mental"—precede the term. *Id.* Instead, the statute simply references undefined and unqualified "labor." *Id.* But the lack of a definition or limiting descriptor is of no moment. "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995)); *see also United States v. Ward*, 972 F.3d 364, 369–70 (4th Cir. 2020). So, I give labor its "ordinary meaning," and that is determined by what the term meant "at the time of the statute's enactment." *United States*

22

*v. George*, 946 F.3d 643, 645 (4th Cir. 2020) (quoting *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010)).

As such, the term's meaning should begin and end with the sources existing during the Miller Act's passage. In 1910, labor generally meant "physical or mental toil"; "bodily or intellectual exertion, esp. when fatiguing, painful, irksome, or unavoidable"; or "work." Webster's New International Dictionary of the English Language 1200 (1910).[1] By 1933, just one year before the Miller Act's passage, labor still denoted the "[e]xertion of the faculties of the body or mind, esp. when painful or compulsory[,]" including "bodily or mental toil." 6 The Oxford English Dictionary 5 (1933). During that same year, Black's Law Dictionary provided a more nuanced definition of labor, first defining it as: "Work; toil; service. Continued exertion, of the more onerous and inferior kind, usually and chiefly consisting in the protracted expenditure of muscular force, adapted to the accomplishment of specific useful ends." *Labor*, Black's Law Dictionary (3d ed. 1933). But it then explained that "[t]he term 'labor' is sometimes given a broader meaning as [i]ncluding all

---

[1] To be sure, this 1910 edition also states that labor can specifically mean "[b]odily exertion or effort directed to supplying society with the required material things; the service rendered or part played by the laborer, operative, and artisan in the production of wealth, as distinguished from the service rendered by capitalists or by those whose exertion is primarily and almost entirely mental." Webster's New International Dictionary of the English Language 1200 (1910). But this definition does not preclude Dickson's materials inventory from qualifying as labor. The materials inventory was part and parcel of "supplying" the federal government with a "material[] thing"—the staircases that inevitably enhanced its wealth. *Id.* Surely, leaving the staircases in a state of disrepair does not leave the federal government financially better off. And Dickson never resembled anything of a "capitalist" because his work was not "primarily and almost entirely mental." *Id.* Indeed, even under its narrow view of labor, the majority acknowledges that "[t]he bulk of Dickson's work" was labor through January 2019. Majority Op. 15.

23

bodily or intellectual exertion done for purpose other than pleasure." *Id.* I have no qualms with adopting the term's broader definition that embraces "intellectual exertion." In fact, the Supreme Court requires us to give the Miller Act a "liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects."[2] *Clifford F. MacEvoy Co. v. U.S. ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107 (1944). The majority's narrower interpretation of labor fails to give the Miller Act the "liberal construction" demanded by the Supreme Court. *Id.*

Other sources from the period likewise support labor's inclusion of mental toil and mental exertion.[3] *See* The Practical Standard Dictionary of the English Language 642 (1936) (defining labor to include (1) "[p]hysical or mental exertion, particularly for some useful or desired end; toil; work"; and (2) "[t]hat which requires exertion or effort; a task"). The majority's narrow definition of labor, which imposes a requirement of "physical work or bodily toil," undermines the term's plain meaning. Even if Congress intended for labor to only include "physical work and bodily toil," the Supreme Court has declared that "the limits of the drafters' imagination supply no reason to ignore the law's demands." *Bostock*

---

[2] In any event, today, no ambiguity remains as to what labor means according to Black's Law Dictionary. Black's now defines labor as "[w]ork of any type, *including mental exertion*." *Labor*, Black's Law Dictionary (11th ed. 2019) (emphasis added).

[3] Jurisdictions of the relevant time period viewed "labor" as encompassing mental exertion. *See Crook v. Commonwealth*, 136 S.E. 565, 567 (Va. 1927) (noting that "labor" includes "[p]hysical or mental toil" (cleaned up)); *Ex parte Messer*, 99 So. 330, 333 (Fla. 1924) ("Labor, according to recognized authority, includes mental effort and intellectual exertion, as well as physical toil.").

*v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020). "Only the written word is the law, and all persons are entitled to its benefit." *Id.*

To be clear, I do not entirely fault my colleagues for attempting to read labor as it was employed under the Heard Act. I wholly agree that "statutes addressing the same subject matter generally should be read 'as if they were one law.'" *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)). But the manner in which the majority employs that principle—and the conclusion derived therefrom—contrives its purpose to evade what ought to be forgone conclusions: that the Miller Act must be liberally construed, and it must be construed in the temporal context of 1935.

When enacted in 1935, the Miller Act repealed the Heard Act of 1894. *See MacEvoy Co.*, 322 U.S. at 105 (observing that, although it "reinstated its basic provisions[,]" the Miller Act repealed the Heard Act). Because the Heard Act was technically rendered null, we must examine the meaning of labor as it stood in 1935, the year of the Miller Act's passage. *See Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) ("[O]ur job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))). Nothing in the Miller Act provides that Congress intended to incorporate a definition of labor that existed over four decades earlier, and yet the majority does just that.[4] Unlike the majority's

---

[4] Again, even pre-Miller Act, some state courts did not subscribe to the majority's restricted meaning of labor. *See Crook*, 136 S.E. at 567; *Ex parte Messer*, 99 So. at 333. And as I discuss shortly, federal courts never directly addressed the issue. *See infra* Part (Continued)

25

approach, my reading of the Miller Act ensures that it remains true to its era, as well as "highly remedial and . . . construed liberally." *Fleisher Eng'g & Constr. Co. v. U.S. ex rel. Hallenbeck*, 311 U.S. 15, 17 (1940) (citations omitted).

C.

Not only do my colleagues give short shrift to the plain meaning of labor, but they enlarge *Maxwell* beyond its scope. *Maxwell* simply has nothing to do with dictating the definitive meaning of labor. *See* 222 F. at 798–800.

In *Maxwell*, a contractor "entered into a contract with the United States for the construction of a post office building at Clifton Forge, Va." *Id.* at 798. One of the contractor's employees "superintended the work of building the post office." *Id.* The employee alleged that he never received his full salary for his work on the project, so he intervened in an action that was brought against the contractor and its surety to recover sums for unpaid accounts that were used to obtain the project's materials. *Id.* at 798–99. The district court issued a decree in favor of the employee for $1,270.27, the entire amount of his claim. *Id.* at 799.

---

I.C. Because federal and state courts never laid down an established or settled meaning of labor, I cannot apply the statutory-construction presumption of "when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85–86 (2006) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1988)). Despite the fact that there is no settled meaning of labor, the majority effectively applies the presumption anyway.

26

On appeal to this Court, the surety argued that the contractor's employee "was not . . . a laborer within the meaning of the [Heard Act]." *Id.* at 799. Relying in part on *Mining Co. v. Cullins*, 104 U.S. 176 (1881), we held that the employee's supervisory work, which included some physical toil, fell within the "purview of the statute." *Maxwell*, 222 F. at 800. We relied upon the employee's deposition in which he "state[d] positively that he was employed as working foreman, and that as such it was his duty 'to go among the men and actually build the building.'" *Id.*

Importantly, neither *Maxwell* nor *Cullins* even applied the Miller Act—the more recent of the two applied the Heard Act two decades pre-Miller Act in the context of woefully dated conceptions of labor. Furthermore, even if we turn a blind eye to these obvious concerns, *Maxwell* does not limit labor to *only* physical exertion and bodily toil or the supervision thereof. Rather, *Maxwell* makes no attempt to construe labor in its own right. *See* 222 F. at 799–800. It never announced a general rule specifying certain categories of exertion, supervision, or toil as the only labor actionable under the Heard Act.[5, 6] *See id.* at 799–800.

---

[5] Perplexingly, the majority frames *Maxwell* as having "already answered the question" of labor's definition, while simultaneously acknowledging that the case provides no explicit guidance, thus "[w]e must read between the lines." Majority Op. 9. To my mind, the position that precedent illuminates our path forward and the position that said precedent is ambiguous—at best—are mutually exclusive.

[6] The majority also invokes *Church of the Holy Trinity v. United States*, 143 U.S. 457 (1892), as supporting its position given that "labor" under the Alien Contract Labor Law was held to require a manual component, thus tracking with the majority's readings of *Cullins* and *Maxwell*. This reliance is hardly persuasive. First, *Holy Trinity*'s interpretation of labor precedes the Miller Act by over four decades and fails to reflect (Continued)

Instead, *Maxwell* turned on an employee's deposition testimony. *See id.* In addition to stating that "it was his duty 'to go among the men and actually build the building,'" the employee testified that "there wasn't a stone, nor a sash, piece of iron, piece of trim, or a part of the heating or electric light plant that I did not actually assist in placing in the building." *Id.* at 800. *Maxwell* compels us to inquire as to the circumstances of an individual's work—nothing more and nothing less.

In this respect, *Maxwell* faithfully followed *Cullins*. *Cullins*, 104 U.S. at 177–79. But *Cullins* likewise never reached what labor does or does not mean under the Miller Act. *See id.* First, *Cullins* interpreted a Utah statute that governed miner's liens—not the Miller Act. *Id.* at 176. Further, like *Maxwell*, *Cullins* only decided that a particular individual's work qualified as labor based upon the case's specific facts. *Id.* I do not fault *Maxwell* for undertaking a similar analysis as *Cullins*, but neither dictates a particular result here.

---

society's conception of the term at the time of the Miller Act's promulgation—a consideration at the heart of our statutory-interpretation analysis. *See George*, 946 F.3d at 645. Furthermore, statutory context matters. It cannot reasonably be said that the legislature's goals in crafting immigration legislation are sufficiently similar to its goals in crafting remedies for nonpayment on federal construction projects such that shared terms necessarily share implications.

II.

Employing a definition of labor that includes "mental exertion" and "mental toil," I would hold that Dickson's materials inventory on February 8, 2019, amounts to actionable labor for purposes of the Miller Act's statute-of-limitations period.[7]

As it concerns the materials inventory, the uncontroverted evidence is that Dickson "traveled to the site to conduct the onsite inventory and verification at the direction and request of the [Washington Headquarters Services of the United States Department of Defense (WHS)]." J.A. 305. The materials inventory required him to "manipulate various items of the inventory left on site, then take a physical inventory [of] the items left on site which had not been incorporated into the Project yet, and thereafter . . . ascribe values to the inventory in a Schedule of Values." J.A. 305. He provides an example of his labor that day: "I had to determine the amount of Schedule 40 pipe which had been incorporated into the project which required [me] to physically inspect and take measurement[s] of the work completed." J.A. 305. At WHS's direction, Dickson clearly engaged in "mental exertion" and "mental toil" on February 8, 2019, by conducting the inspection, measuring materials, and eventually creating a Schedule of Values in furtherance of the project. He thus performed labor in accordance with my conceptualization of the term.

---

[7] I readily agree with the majority that Dickson provided labor before February 8, 2019, which included: taking out the trash, conducting measurements, watering concrete, reinforcing steel, physically inspecting materials, and supervising workers. J.A. 302, 908–10 (Dickson describing his various duties).

29

But he also satisfied the majority's requirement of physical exertion and bodily toil when he "manipulate[d] various items" during the inspection and inventory. J.A. 305. The majority echoes the district court's conclusion that Dickson's manipulation of various items was primarily clerical or administrative in nature, and thus not cognizable as labor under the Miller Act. This conclusion, however, is irreconcilable with the majority's definition of labor. If all that labor under the Miller Act textually requires is that (1) a claimant performed some work, and (2) that work involved physical exertion or bodily toil—or the supervision thereof—then the clerical goal of a task is entirely irrelevant. *See* 40 U.S.C. § 3133(b)(1) (also requiring that the labor must be performed in furtherance of the contracted-for job).

Even if the majority's definition of labor left room for a clerical exception, the sorts of non-actionable tasks that I perceive as truly administrative or clerical are, by way of example, tasks relating to overhead like payroll or headquarters bills. To be sure, the ability to perform work relies on the completion of such background tasks, but they exist wholly untethered from a discrete job or contract, and they more directly relate to the profitability of the performing entity itself rather than the completion of a contracted-for project. Dickson's work was of an entirely different nature. He physically exerted himself, on the jobsite, at the behest of WHS, for a purpose that directly furthered that entity's project goals.

Furthermore, it cannot reasonably be said that manipulating pipe or other items with one's own two hands does not involve at least *some* amount of physical exertion. And nothing in the Miller Act lends itself to the idea that some exertion is cognizable while

30

other exertion is not. Yet the majority's approach to Dickson's labor implicitly relies on just such an amorphous spectrum of physicality. Did he not exert enough pounds of force on the items that he manipulated? Did the items only shift a few inches rather than a few feet? We lack both the nuanced details of his exertion, as well as a practical way of evaluating sufficiency such that the majority's definition of labor offers a workable approach.

In addition to its resounding absence from the text of the Miller Act, an arbitrarily gauged physicality requirement corrupts any sound application of the Act in the context of modern construction. Consider, for example, the operation of a modern excavator, bulldozer, crane, drum roller, haul truck, grader, or even the formidable earth-moving scraper. These vehicles often serve as the bedrock of modern construction in heavy-civil contexts—contexts to which the Miller Act is essential. But the operators of such machinery, particularly in models manufactured in the last decade or so, effectuate substantial labor by lifting hardly more than a hand, and sometimes little more than a finger. Envisioning the cab of a modern excavator, an operator need only manipulate two joysticks to perform many impressive feats. Surely it cannot be said that such operators fail to perform actionable labor under the Miller Act. And yet, applying the majority's approach, Dickson physically exerted himself as much or more by lifting and handling inventory

31

items than many operators of modern equipment would in the course of displacing ton after ton of aggregate.[8]

Put differently, my analogy to modern construction equipment bears two conclusions. First, insufficient grounds exist to disqualify Dickson's claim for his having not physically exerted himself enough. If physical exertion is the touchstone of this analysis, as the majority purports it to be, then Dickson's inventory handily qualifies, particularly when it would defy commonsense to exclude other activities (like equipment operation) performed with even less physical exertion than that required by Dickson's work. Second, the modern era demands a more judicious approach to labor than the majority's narrow view. If an individual must surpass a threshold of physicality under the Miller Act to have a cognizable claim, then the Act no longer coexists with the realities of modern construction, and its remedy falls to pieces as applied to countless situations. In other words, the analogy bespeaks the impracticality of the majority's position as applied to both the instant dispute and modern building.[9] Thus, recognition of a mental component to labor is essential to the Miller Act's continued viability after nearly a century of successfully effectuating subcontractor protections on federal projects.

---

[8] Similarly troubling comparisons could be drawn between Dickson's task and tasks completed by other laborers with the aid of powered hand-tools.

[9] Even in 1935, the majority's physicality test would have excluded plenty of actionable, machine-aided labor, thus further bespeaking the necessity of a broader definition of the term—consistent with how it was surely understood at the time.

Turning to the Miller Act's statute-of-limitations bar, Dickson's suit cannot proceed unless it was filed "no later than one year after the day on which the last of the labor was performed." 40 U.S.C. § 3133(b)(4). Because I view Dickson's work on February 8, 2019, as actionable labor, he had until February 8, 2020, to file the instant suit.[10] He met that deadline when he filed his civil action on February 5, 2020. Consequently, I would hold that the Miller Act's statute of limitations does not bar Dickson's claim, and I would reverse the district court's opposite conclusion.[11]

III.

I see no justification for circumscribing the meaning of labor as the majority does today. The majority's contrived standard ignores the relevant definitions of labor that existed during the Miller Act's enactment, and it also contradicts our common sense in

---

[10] The majority notes that it is "unclear whether the work [on February 8] was 'provided for in the contract' because it was performed after the contract was terminated." Majority Op. 16 n.8 (quoting § 3131(b)(2)). But the record seems clear. On December 20, 2018, WHS told Dickson that he "*must provide* an inventory of all materials on-site and at any off-site locations as soon as practicable, but not later than 31 Dec 2018." J.A. 1113 (emphasis added). By January 31, 2019, WHS told Dickson that it never received a materials invoice, and by February 8, 2019, it again requested this submission. *See* J.A. 1126–28. WHS then provided Dickson with another extension to submit the materials invoice. *See* J.A. 1125 ("The due date is extended from 5 PM ET on 11 Feb 2019 to 5 PM ET on 14 Feb 2019."). So WHS repeatedly extended Dickson's contractual obligations as Fidelity seems to virtually concede in its briefing. Fidelity's Resp. Br. 4 ("[T]he Owner allowed FEI until February 11, 2019 to submit the requested materials inventory under a full reservation of rights, *including the contractually required completion date of December 31, 2018*." (emphasis added) (citing J.A. 1127)).

[11] At oral argument, Fidelity conceded that Dickson's suit was timely if he performed qualifying labor on February 8, 2019.

33

2023.   Labor is a broad term that captures both an individual's physical and mental exertion.  And indeed, it contemplates the very mental energies that my colleagues and I have expended in fashioning these respective opinions.

Because I view labor as encompassing far more than the majority, I would reverse the district court's grant of summary judgment to Fidelity and remand this case with instructions to the court to grant summary judgment in favor of Dickson on the meaning of labor, which would preclude Fidelity's statute-of-limitations defense.  Alternatively, I would hold that Dickson's inventory was sufficiently physical to qualify as labor even under the majority's restrictive definition and remand with the same instructions.[12]  I would then allow the district court—in the first instance—to determine the proper amount of Dickson's damages or to proceed to a damages trial if appropriate.  I respectfully dissent.

---

[12] At the very least, assuming application of the majority's definition of labor, I would hold that a genuine factual dispute exists as to the degree of physicality in which Dickson engaged during the inventory, thereby precluding summary judgment.

34